May it please the Court, I'm Janice Goodman, and together with Ria Tabago and James Essex of the ACLU, I represent the plaintiff appellant in this matter. And we're before you today to request that you reverse, in light of Zarda v. Altitude Express, and based on the entire record that is before you on this appeal, we ask that you reverse the summary judgment order of the lower court and remand with instructions that it be set, the case be set down for trial. And that the... You know, normally in circumstances like this where our court or the Supreme Court has issued an intervening decision which certainly bears on the subject matter of the wisdom of the district court in the first instance, and have it apply the law pursuant to our instructions without our telling it what to do, and let that take place. I assume you'd be satisfied with that. We would be certainly acceptant of that, Your Honor, and think that there's no doubt that this case should be remanded at a minimum. But we think that the record here is so strong that we should – it should not be necessary to have the judge and... I knew that would be your answer, but as I said, normally, regardless of how strong the record seems to appear to the parties and maybe even to us, we do like to have the district court's first take on that. I understand, but... Tell me why that's inappropriate. Well, this is for two reasons. One, you have a – this is a de novo proceeding, no matter what. This is a de novo proceeding that you are empowered and directed to look at all the facts and make a determination based on those facts as to whether there is sufficient evidence here in the record to support – to overturn a summary judgment motion. And I think in this case, it is so clear that we have several aspects of the – several aspects of proof that would lead to your reversal. One of the reasons that Judge Daniels provided for granting summary judgment was that there was a legitimate nondiscriminatory rationale for the termination that was not shown to be pretextual, and there's an argument, I imagine or take it, that that could apply even if Judge Daniels had appropriately recognized sexual orientation discrimination as cognizable under Title VII. So what do you say about that? Well, it might be a certain amount of information that is not pretextual, but the standard of this circuit is that we do not have to show that all of the – that only one decision can be reached, that all we need to show is that there is a – that a – one of the motivating factors might be – it could be inferred to be the discriminatory factor, even though there are other rational – You're telling me that if there is a legitimate nondiscriminatory reason to terminate someone, and it's not shown to be pretextual, that is not enough? I'm sorry. I don't think I'm following that, but I'm not – I don't think that's what I'm saying. What I'm saying that if there is sufficient pretext – evidence of pretext, that is sufficient to overcome a motion for summary judgment. I'm saying – what I'm saying, or what I'm asking, is that Judge Daniels appears to have decided that there was not any evidence of pretext. Am I right or wrong about that? I don't think he reached that issue, Your Honor. I think that he decided two things. One, he decided Simonton applies, and therefore, there cannot be any sex orientation, sex discrimination claim whatsoever. Then he went to sex stereotyping, and he decided in reading of your prior decisions in Dawson v. Bumble and Bumble, he decided that the courts have found actionable Title VII claims in cases where plaintiffs suffered adverse employment action for failing to conform to stereotypical gender norms through behavior or appearance, and he was really focused on that. He held at the argument, I don't know whether you – not necessarily, not in the record, but in the argument, he was totally focused on do we have any evidence that there was. Breyer, I appreciate that, but if you just look at his opinion, pages 8 to 9, he seems to go through the analysis, and all of my questions are directed to and are prompted by my colleague Judge Hall's question, which is you're asking us more affirmatively and more aggressively to reverse a summary judgment decision as opposed to vacating, letting Judge Daniels decide. If he wants to redo the summary judgment, he can do that. You're right. I think that it's important for this Court to lay out at least some guidelines so that the lower courts know that sex discrimination based on gender orientation or sexual orientation. Well, haven't we done that? Haven't we done that in Georgia? I don't think that you have done that in terms of establishing gender orientation and establishing what establishes a pretext for discrimination and what gives inferences and reestablishing. So Zarda – Zarda was very focused on a discrete issue. It did not intend, I think, or pretend to displace all of our case law regarding pretexts. So that case law is very clear. I'm not disputing that it – I don't think it was – I don't recall it being directly addressed in Zarda. And what I thought was most important in Zarda is that, in fact, you did reverse Zarda and sent it back for trial and upheld the lower court. At that point, the lower court said, well, we are not a platform. Well, that's because it went to trial. That's true, Your Honor. So this is a different situation, Ms. Goodman. This is summary judgment, a granted summary judgment based on an – I take it it's agreed an incorrect legal standard that's now been overruled by Zarda. And the question is, should we send it back, remand it back so that Judge Daniels can do whatever he wants to do, or should we, as you're requesting, send it back specifically for trial? I have to go back to the fact that you have the right and the obligation to review De Novo, and I believe that the evidence is so strong on several issues. Pretext, the rationales that are given, you know, the sales goals that were not met, when, in fact, nobody in 2013, except one guy who, by a couple of dollars, made a sales goal, nobody met sales goals but my client, Mr. Carson, was fired, that he was set up to fail at that, no way he could possibly have achieved the goals that were set, all leading to the ultimate decision. The major pretext I would submit to you is they hired someone or promoted someone who had absolutely no experience, sales experience, if the real reason was we don't think the job is being well done by Mr. Carson, who was only there for 20 years and was only the outstanding salesperson for all that time, if we don't think that the job is being well done by him, won't you think that a good employee would go out and try to search for somebody who has sales experience and knowledge and ability? But no, they took a straight man whose only experience was tending to the vault. He was an inventory clerk at best. Let me ask you this question and then I'll let you sit down, since you're well over the time that your red light has come on. If we send it back to trial, for trial, as you request, is the issue of pretext off the table? Is that already determined? No, I think, no, I. So it's still a live, whether it's pretext, whether it is pretext or not, it's still a live issue? Yes, Your Honor, because I think that, as I recall in the Reeves case, that that came down on post-trial motions where they discussed pretext. You don't have to show pretext plus, you just have to do a strong enough case of pretext will suffice to overcome. But your point at this time is that they haven't shown a strong enough case of pretext and they can get a chance to do that at trial. No, my case is that we have shown a strong enough case for pretext to overcome summary judgment. Yes, you have accurately corrected. You've said what I tried to say. Yes, okay. So my time is up, I have reserved three minutes. You've reserved three minutes and you will have that, Mr. Limonides. Thank you, Your Honor. Appreciate your time. James Limonides with Fox Rothschild on behalf of the employer. It, I'm sure, is going to shock you all that I also tell you that this case is very strong. And I also agree that there is something that Your Honor should be doing besides remanding it. I think this gives this court an opportunity to help define Zarda and to say what Zarda is not. On this record, there is nothing to suggest, to intimate any type of discrimination. Indeed, there are incredible, non-discriminatory, legitimate business reasons for the employer's decision. And as Your Honor has pointed out, Judge Daniels specifically looked at all of the evidence. A couple of the interesting things that Judge Daniels said was that on page 800 of the record in his decision, Judge Daniels notes, plaintiff's argument conflates sexual orientation discrimination with a claim of gender stereotyping claim. And I think the findings he made were with respect to the gender stereotyping claim. I hear that, Your Honor, and I understand completely. But I also bring Your Honor down to the next paragraph. The next paragraph says, moreover, plaintiff has failed to show he suffered an adverse employment action under circumstances giving rise to an inference of intentional discrimination based upon plaintiff's membership in a protected class. Not based on gender stereotyping. I'm just suggesting that His Honor has looked at the facts he referred to and decided did not prove the case were related to gender stereotyping. And the only thing I'm pointing out to Your Honor is that those are all the facts that if you look at all of the facts. Just a second. Of course. That's not all the facts there are. There were the fact that he was the only one who was fired for declining sales. There were declining sales everywhere. He had a terrific difference in sales, but that was only after most of his territory or a good chunk of his territory was given to somebody else. If I could address each of those. Okay. Let me go. I'll give you a couple more to address. And the fact that he was disciplined because he gave presents to his staff in cash instead of cards, instead of store cards, and there was another fellow who was not disciplined even though he had stolen $5,000 worth of money. I think he says if you compare him to how other people were treated, he was discriminated against. That's what he says. My view is somebody else has to make that decision, but he's got some facts there. And if I can just address each of those. Okay. Go ahead. As for the declining sales, his were the lowest percentage on a non- Was that after his territory was taken? And the sales were adjusted down, yes. And I think that's exactly the point, Your Honor. Having adjusted some of his sales territory, the goals would be reduced. So this was a benefit to him to reduce those goals so he could have an opportunity to come closer to accomplishing them. If he had been held to the higher goals from a bigger territory, then I would understand what Your Honor is saying. The point is that there was a decrease. The other thing to understand is that the Mr. Kerrigan himself had established some of his goals. He would set the goals to begin with. Indeed, the goals for the year that was specifically declining occurred after a meeting with Ms. Bodam, who was the president of Breitling before the Mr. — forgive me if I'm going to completely mispronounce his name — Percet, and it's plaintiff's position that it was Mr. Percet that brought in this boys' club. Well, except that the other president who had been there all those years helped in establishing those goals. They ended up reducing those goals for him, and he still was not able to accomplish them. He was the lowest performer, and he was tied for the second lowest on a couple of times. That's like a great argument for summary judgment. It does. And if we're looking at it, do you know where— We are not a court of summary judgment. I understand completely, Your Honor. I fully appreciate that. Why isn't it appropriate to remand this back? You can maybe have your shot at summary judgment again, or if you lose, you go to trial. You're absolutely right, and I completely respect that. I'm simply suggesting that the panel has a unique opportunity to help define ZARTA to see what it is not. In what way? And each of you say we win, you win, which sounds to me like— I know, Your Honor— Let's let the court figure it out in the first instance, frankly, and with all due respect to the fine arguments each of you has made, and then let a court of a panel of this Court review it after one of you wins and one of you loses and one of you is not happy. I absolutely appreciate that. I'm simply attempting to respond to the argument that had been presented to you about a de novo review. What is ambiguous about ZARTA? Well, exactly what happens in all cases. A decision is made that sets out sort of standards, and then that those standards— The standard is that sexual orientation discrimination is prohibited by Title VII. No question. Okay. Absolutely. What's ambiguous about that? About that is whether this case falls within that. Because that's how case law is defined. But he made a sexual orientation discrimination claim, did he not? He did, and a record was created and a record was presented. And the problem that we've got is that Judge Daniels seems to have decided—I'm not saying that it was incorrect at the time, because he didn't have the benefit of ZARTA—that a sexual orientation claim was not cognizable under Title VII. Is that correct? That is correct. The only thing I also bring to Your Honor's attention is the next step that he said. Moreover, looking at this, he found that there was no insufficient evidence of an adverse employment action under circumstances to give an inference of intentional discrimination based on a membership in a protected class. I'm simply suggesting that I think— I think he was talking about the gender stereotyping claim at that point. I understand, Your Honor. Okay. I'm simply attempting to present— Anyway. And if he were talking about the other claim, I think he would have had to say a little more, because he didn't address the other evidence that goes directly to the other claim. He addressed, I think properly, the evidence that went towards the gender stereotyping claim. Anyway. Thank you. So a little extra. Right. Let me just address a few things and try to reconvince you that we're ready for trial. And I do strongly feel that at some point the Seventh Amendment has to come into play, that at some point juries should get to see some of these cases rather than us playing page after page of written argument where my adversaries and I will keep saying very cogent things, but we're not going to get many places. And I think it's so clear here that there is a conflict of— Well, I don't think it's that clear. Yes, Your Honor. It seems to me that, yes, his territory was reduced. In absolute terms, he didn't make as many sales, but he did have a difference in percentage of goals. There was another thing that happened. And that I think before the new management came in, the old management said that you make $200,000 a year, you don't have enough customer calls to justify that. So that doesn't mean they win, in my mind. That means that summary judgment in your favor is a little tricky. I'm not sure where that last fact comes from. The fact of the matter is that in 2012, the evidence will show that Mr. Cargan made more sales calls than anybody— Okay, it's— —five of the— It's A-235. Mr. Boat—President Boatman emailed Cargan stating that the next wave of leaders will not accept customer activity at the level. You know— Your Honor, they— —stuff in both directions. And so for us to say here that it's so clear that we have to award summary judgment to your side— I'm not asking that you award summary judgment to our side. I'm asking that you deny them— Deny summary judgment. I mean rule on your side on the summary judgment motion and order trial. I might answer that directly. The mere fact that you see that there's both sides, that's a jury. You cannot make — the Court should not be making credibility decisions. No. What I'm saying is that for a court of appeals to say it's so clear that we must deny summary judgment is really a strange position to put a court of appeals in. You're pointing to just one factor. And as this Court has often said, that you have to look at the mosaic, the wall, the totality of all the circumstances. That one factor is just one of— But Judge Daniels, now that he has a different legal standard, could look at that and say is summary judgment warranted for their side or should you go to trial? I am convinced that he can look at it. I am convinced that — I wouldn't be trying so hard to convince you. I'm convinced that he will find that summary judgment does not apply. Let me get to just one — one issue that was just given the — the reduction in territory, and therefore, quote, we reduced his — his goals. Now, in fact, that year, that's 2013, the evidence shows that Mr. Carson's goal was increased 14 percent. His goal was increased 14 percent when nobody else except Ms. Summers was increased more than 7 percent. So we have — you know, I don't know whether you remember I Love Lucy and Ethel and Lucy went to the chocolate factory and they were trying to put the chocolates in the box. I guess none of you saw that. And every time— I saw it. I saw it. Every time you put the chocolate in the box, they kept speeding up the — the— Conveyor belt. Conveyor belt. Thank you so much, Your Honor. They kept speeding it up. So there was no way you could win. And that's precisely what was happening to Mr. Carson. Every time he came close to doing things that, you know, they wanted him to do, he could not win because they kept speeding up the — the belt on that. And the same thing goes for the establishment of the original — the original goals. The original goals that Mr. Prusert established in 2011, Mr. Carson was increased 92 percent, nobody else more than 73 percent. What's most interesting is to compare him with Mr. — Representative X. Representative X and Mr. Carson had similar goals in 2009 and 2010. In fact, Mr. Carson — Mr. — Mr. Goodman, you're well beyond your time. Okay. Well, well beyond your time. And we had your arguments in mind, but—